**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jaie Israel, | No. CV-20-01185-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| U.S. Bank, NA, | |
| Defendant. | |

Before the Court is Defendant U.S. Bank, NA's Motion for Summary Judgment (Doc. 58). For the reasons below, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Jaie Israel ("Plaintiff") worked as a banker for Defendant U.S. Bank ("Defendant") beginning in 2015. In 2018, she was hired by a branch in Scottsdale, Arizona ("Scottsdale branch"), which was located inside a Safeway grocery store. (Doc. 1 at 3.) Plaintiff is an African American woman who was eight months pregnant at the time she was hired by the Scottsdale branch. (Doc. 58 at 1.) Branch Manager Travis Canfield ("Mr. Canfield") made the decision to hire Plaintiff. (*Id.*) The parties dispute when exactly Mr. Canfield was made aware of Plaintiff's race and pregnancy.

Shortly after Plaintiff began working at the Scottsdale branch, she began to have difficulty standing due to her pregnancy. Although the parties dispute the course of events leading up to Plaintiff's request for a chair, on September 10, 2018, she provided Mr.

Canfield with a doctor's note stating that she needed to conduct her work sitting down. (Doc. 59 ¶ 23.)  By September 20, 2018, a chair was provided to Plaintiff.  (Doc. 59 ¶ 26.) Plaintiff alleges that the chair provided to her was unsafe.  Although the details of the events that followed are also disputed, the parties agree that sometime thereafter, Mr. Canfield discussed a potential transfer to a different location, which Plaintiff declined, and an arrangement was made for Plaintiff to use Mr. Canfield's office, when needed, so she could sit down while working.  (Doc. 59 ¶ 31; Doc. 69 ¶ 31.)  Plaintiff also asserts that during that time period, Mr. Canfield critiqued her for taking time off work for her doctor's appointments and did not offer her the opportunity to work overtime hours, unlike other employees.  Plaintiff took leave from October 30, 2018, to January 30, 2019; she states that she used one week of unpaid leave to begin her maternity leave early.  (Doc. 69 ¶ 116.)

While Plaintiff was on maternity leave, her business cards were removed from display at the Scottsdale branch.  After she returned from maternity leave, Plaintiff alleges that she had difficulty finding a private and sanitary location to pump breast milk.  The parties dispute to what extent Mr. Canfield was made aware of Plaintiff's requests for a proper space to pump, but Plaintiff states that she made Mr. Canfield aware of her request for a location to pump at the branch one or two days after her return.  (Doc. 69 ¶ 121.) Plaintiff alleges, and Mr. Canfield denies, that Mr. Canfield suggested that she use the Safeway restroom to pump.  (*Id.*)  Defendant attempted to arrange for Plaintiff to transfer to a location with a proper lactation room, but Plaintiff declined the transfer because the hours did not work for her.  (Doc. 69 ¶ 128.)  Defendant ultimately created a lactation room at a branch in Sun City on May 23, 2019, to which it agreed to transfer Plaintiff.  (Doc. 59 ¶¶ 71-72.)

Plaintiff alleges that in March 2019, she initially requested to be placed on short-term disability leave or receive a workplace accommodation, but her psychologist erroneously denied the request, "believing that company policy did not allow her to complete paperwork for the assessment."  (Doc. 69 ¶ 132.)  Plaintiff also alleges that she felt overwhelmed and experienced panic attacks at work in May 2019. (Doc. 69 ¶¶ 137-38.)

On May 23, 2019, Plaintiff went on bereavement leave for five days for a death in her family. (Doc. 69 ¶ 140.) She further alleges that as of May 24, 2019, her milk supply was decreasing. (Doc. 69 ¶ 141.) In June 2019, Plaintiff was placed on short-term disability leave, and she remained on disability leave until December 2019. In July 2019, Defendant transferred Plaintiff to the Sun City branch, where she began working upon her return from leave in December 2019. (Doc. 59 ¶¶ 72, 74; Doc. 69 at 1.)

Additionally, in March 2019, Plaintiff applied for a personal banker position at Defendant's location in Surprise, Arizona. Plaintiff interviewed for the position, and she alleges that she was verbally offered the role. Shortly thereafter, however, the role was offered to someone else, and Plaintiff was notified she did not receive the position on April 17, 2019.

Over the course of events, Plaintiff filed three charges with the Arizona Civil Rights Division ("ACRD") and Equal Employment Opportunity Commission ("EEOC"). The first charge was filed in December 2018, alleging discrimination based on race and sex. In that charge, Plaintiff highlighted Mr. Canfield's statement that he did not know she was pregnant, her pay, the fact that she had to work weekends, lack of training, lack of overtime, and difficulty getting time off for doctor's appointments. (Doc. 62-1 at 9-10.) She received a right to sue letter from ACRD on June 6, 2019, but did not receive a right to sue letter from the EEOC. Plaintiff filed her second and third charges with the ACRD and EEOC on June 25, 2019. The first of these charges alleged retaliation related to her December 2018 charge, and the second addressed her complaints surrounding her inability to pump at work. (Doc. 65 at 9, 17.) It does not appear that she received a right to sue letter from the EEOC on either charge. Additionally, in January 2020, Plaintiff amended her third charge to include discrimination on the basis of a disability. (Doc. 65-5 at 36.) On June 15, 2020, she filed her complaint in this case.

## DISCUSSION

### I.    Legal Standard

Defendant moves for summary judgment on all of Plaintiff's claims. The purpose

of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* As the Ninth Circuit has said, "[t]his burden is not a light one." *Id.* To meet this burden, the "non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* Additionally, parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). A district court has no independent duty "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

## II. Analysis

### A. Counts I, II, III, and IV (Title VII Discrimination and Retaliation)

Plaintiff's Title VII claims are not impacted by the Arizona Civil Rights Division's Right to Sue Notice. The Ninth Circuit has expressly held that a state agency's right to sue

letter does not trigger the ninety-day clock to sue under Title VII or the ADA; the right to sue notice must come from the EEOC. *Scott v. Gino Morena Enters., LLC*, 888 F.3d 1101, 1111 (9th Cir. 2018) ("[T]he statute makes no reference to a state agency's right-to-sue notice starting the 90-day clock. Instead, the statute describes the duty of 'the Commission'—i.e., the EEOC—to 'notify the person aggrieved' and provides that a civil action may be brought 'within ninety days after the giving of such notice.'"). Thus, the ACRD right to sue notice has no bearing on Counts I through IV.

### 1. Race and Sex Discrimination

To establish a prima facie case of race or sex discrimination, Plaintiff must show that "(1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008). "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)). Once a plaintiff makes out a prima facie case, the burden shifts to the defendant, under the *McDonnell Douglas* framework, to provide a legitimate, non-discriminatory reason for the alleged disparate treatment. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003). If the employer can do so, the burden shifts back to the Plaintiff to establish that the employer's reasoning is pretext for discrimination. *Id.* A Plaintiff can prove pretext in two ways: "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000). Additionally, under the Pregnancy Discrimination Act ("PDA"), "for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983).

Plaintiff appears to allege the following adverse employment actions: (1) lack of overtime opportunities, (2) working weekends, (3) not receiving a particular banker training, (4) the removal of her business cards while she was on maternity leave, (5) denial of a transfer to the Surprise personal banker position, and (6) denial of a proper space to lactate. For the following reasons, each of these actions except the denial of overtime cannot support a disparate treatment claim.

*Overtime:* First, Plaintiff's race and sex discrimination claims as to the denial of overtime survives summary judgment. Plaintiff states that she only asked for overtime "once or twice" after she returned from maternity leave. (Doc. 59-2 at 90-91.) Nevertheless, a denial of overtime opportunities can constitute an adverse employment action because it can negatively affect the employee's compensation and "thus affect the terms, conditions, and privileges of [Plaintiff's] employment." *Kim v. Potter*, 474 F. Supp. 2d 1175, 1189 (D. Haw. 2007); *see also Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847-48 (9th Cir. 2004). Defendant states that Mr. Canfield gave other employees overtime before offering the opportunity to Plaintiff because the other employees only worked 30-hour weeks. (Doc. 59 ¶ 11.) Plaintiff does not dispute that the other employees were 30-hour employees but alleges that she nevertheless saw on the schedule that they worked over 40 hours a week sometimes. (Doc. 59-2 at 89-92.) Thus, although the employees may not have been similarly situated if they only worked 30 to 40 hours a week, because, at times, they worked at least 40-hour weeks just like Plaintiff, they sufficiently constitute similarly situated comparators. Because the other employees were similarly situated and did not possess Plaintiff's protected characteristics—namely, being African American and pregnant—Plaintiff establishes a prima facie case of disparate treatment discrimination.

Defendant offers the other employees' 30-hour employment status as a nondiscriminatory reason for the disparate treatment. As proof of pretext, Plaintiff offers Mr. Canfield's statement that he did not think to offer her overtime because she was pregnant. (Doc. 59 ¶ 51.) Plaintiff may show pretext "by showing that the employer's

proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable." *Chuang*, 225 F.3d at 1127.  She may also show pretext with direct evidence "by persuading the court that a discriminatory reason more likely motivated the employer." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Mr. Canfield's rationale as to why he did not offer Plaintiff overtime is likely direct evidence of a discriminatory motive because he states the reason that he did not think to offer Plaintiff overtime is because of her pregnancy.  Even if the statement is not direct evidence of a discriminatory motive, it is at the very least, inconsistent with later statements that it was more expensive to offer Plaintiff overtime.  At the summary judgment stage, this inconsistency is sufficient to show pretext, and determining the credibility of the statements is a task for the jury.

*Weekends:* Next, as to working weekends, Plaintiff does not demonstrate a similarly situated comparator, as required by her discrimination claim.  Defendant asserts that Plaintiff's application materials for the position indicated that she was willing to work weekends.  Plaintiff's application says that she was willing to work Saturdays, and her offer letter stated that she would work Sundays.  Plaintiff alleges that sometimes she was required to work both weekend days.  (Doc. 59-3 at 3-4; Doc. 59-2 at 126-27.)  However, she also states that she did not say she did not want to work weekends.  (Doc. 59-2 at 86-97; Doc. 59-3 at 31.)  While Plaintiff alleges that Mr. Canfield and another employee, Alison Wals ("Wals"), did not have to work weekends, she does not demonstrate that their employment was conditioned on working weekends.  Plaintiff demonstrated a willingness to work weekends in her application, failed to state that she did not want to work weekends, and received an offer letter indicating she would work weekends.  Because Plaintiff does not show that any other U.S. Bank employee who was hired to work weekends was exempted from doing so, she cannot establish that the requirement to work weekends was discriminatory and causally related to her race or sex.

*Training:* As to training opportunities, Plaintiff does not show that any similarly situated employee was treated more favorably or that Defendant's proffered non-

discriminatory reasons were pretextual.  Plaintiff alleges that she was denied completion of a particular bankers' training that she should have completed in 2015 when she started working at U.S. Bank.  (Doc. 59-2 at 77-79.)  Plaintiff has received several trainings from U.S. Bank over the course of her employment.  (Doc. 59-6 at 1-26.)  Mr. Canfield claims that when Plaintiff arrived at the Scottsdale location, he did not immediately enroll her in a new banker training because he believed she had completed it. (Doc. 59 ¶ 38.)  Plaintiff disputes this evidence, asserting that she told Mr. Canfield she never completed the training, and he told her "she would just have to go without it."  (Doc. 69 ¶ 38.)  Mr. Canfield states that he attempted to enroll Plaintiff in specific new banker trainings after she asked for the training, but he was unable to because she was not a new banker.  (Doc. 59 ¶ 40.)

Plaintiff does not demonstrate that similarly situated individuals outside her protected class were treated more favorably with regard to training.  The only individual she alleges received the new banker training that she requested is Wals, who was a new banker, hired after the Plaintiff.  Because Plaintiff had been a Universal Banker for over three years, she was not similarly situated to Wals, who required more training as a new banker.  Additionally, Plaintiff does not offer "specific and substantial evidence" that Defendant's rationale for only providing the training to Wals was pretextual.  "A showing that the [Defendant] treated similarly situated employees outside [Plaintiff's] protected class more favorably would be probative of pretext."  *Vasquez*, 349 F.3d at 641.  However, "[t]o show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives."  *Id.* at 642. Here, given the differences between Plaintiff's and Wals's experience levels they are not similarly situated.  Thus, without any further evidence as to pretext, no reasonable jury could determine that Defendant's proffered reasons for not providing Plaintiff the training were pretext for racial or sex-based discrimination.

*Removal of Business Cards:* Plaintiff does not show that the removal of her business cards during her three-month maternity leave was an adverse employment action under

Title VII.  The Ninth Circuit "define[s] adverse employment action broadly."  *Fonseca*, 374 F.3d at 847 (internal quotations omitted).  "For claims of disparate treatment under Title VII, an adverse employment action is one that 'materially affects' the compensation, terms, conditions, or privileges of employment."  *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018).  While there is no bright line rule as to specific actions that can constitute adverse employment actions, the Ninth Circuit has determined that actions such as transfers of job duties or undeserved performance ratings can suffice.  *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  However, the Ninth Circuit has held that some actions are not sufficient to constitute an adverse employment action, such as losing an employee's performance evaluation, initiating a misconduct investigation, allowing employees to view pornography at work, and ostracism or exclusion from meetings that did not result in an employment disadvantage.  *See Campbell*, 892 F.3d at 1013; *Mischel v. Caithness Operating Co.*, 327 F. App'x 703, 705 (9th Cir. 2009); *Hutchinson v. Seagate Tech.*, 147 F. App'x 647, 648 (9th Cir. 2005).  Regardless of whether these actions made the plaintiffs' employment uncomfortable or unpleasant, the plaintiffs failed to show that they altered the conditions of employment or affected their compensation.  *Id.*

Here, Plaintiff similarly does not show how the removal of her business cards during her leave of absence materially impacted either the compensation or the terms and conditions of her employment.  While she alleges that she "had her own clients which is why she was damaged when her business cards were removed," she does not show that her compensation was client-based or that she was financially rewarded by individual clients. (Doc. 69 ¶ 145.)  To the contrary, it appears her compensation was hourly, and she worked scheduled hours, as determined by a manager.  (*See* Doc. 59-3 at 31.)  Additionally, she does not offer evidence to show how the removal of the business cards while she was on leave materially impacted the terms and conditions of her employment.  The mere fact that she had her own clients does not, by itself, suggest that her employment was materially

1  altered by the business cards being removed during her leave.[1]  Without evidence that

2  Plaintiff's compensation or conditions of employment were negatively affected by the

3  temporary removal of her business cards, it does not constitute an adverse employment

4  action under Title VII.  As such, Plaintiff does not preserve the claim.

5       *Denial of Personal Banker Position:*  Plaintiff also alleges that the denial of the

6  personal banker position ("PBP"), which she interviewed for and was initially told she

7  received, was discriminatory.  Defendant states that the person chosen had a more realistic

8  pay expectation, more relevant experience, and had previously filled in at the Surprise

9  location. (Doc. 63 ¶ 14.)  Plaintiff fails to articulate any reason why Defendant's reasoning

10  for its chosen candidate is pretextual.  In light of the fact that the chosen candidate had

11  previously worked at the Surprise location and had experience in the role, as opposed to

12  Plaintiff who did not, Defendant's rationale appears legitimate and nondiscriminatory.

13  Without evidence to demonstrate that the statement is pretext, Plaintiff cannot succeed on

14  a sex or race discrimination claim based on the denial of the PBP.

15       *Denial of Lactation Space and Breaks:*  Lastly, even assuming the denial of a

16  lactation space or breaks to lactate is an adverse employment action under Title VII,

17  Plaintiff has not shown that Defendant's failure to provide such a room was discriminatory.

18  "The line between discrimination and accommodation is a fine one.  Taking adverse actions

19  based on woman's breastfeeding is prohibited by the PDA but employers are not required

20  to give special accommodations to breastfeeding mothers."  *Hicks v. City of Tuscaloosa,*

21  *Alabama,* 807 F.3d 1253, 1260 (11th Cir. 2017).  Here, there is a genuine dispute of fact

22  as to the degree that Defendant understood Plaintiff's request for a space and time to pump

23  milk.  (Doc. 59 ¶¶ 66-68; Doc. 69 ¶¶ 67-68.)  However, even if Mr. Canfield understood

24  the request, Plaintiff fails to demonstrate that the denial of the request was discriminatory.

25  The only argument Plaintiff makes alleging that the denial of the time or space to lactate

26  was discriminatory is that the bank had a policy requiring a "clean, private, secure room

27
28  [1] At Oral Argument on January 26, 2023, Plaintiff argued that the Court should infer that because business cards help generate client interest, their removal during this period could, theoretically have deprived her of the benefit of client interest or future client relationships. This type of speculation alone is not sufficient to establish an adverse employment action.

for lactation, but that did not happen under Canfield for months."  (Doc. 68 at 9.)

Defendant does not appear to dispute that there was no proper space for Plaintiff to lactate at the Scottsdale branch.  However, Plaintiff does not introduce evidence that the lack of a lactation room was discriminatory based on Plaintiff's sex or race.  Further, Plaintiff does not explain why Defendant's lack of a room is pretext for race or sex discrimination.  To the contrary, Defendant attempted to relocate Plaintiff to a branch that had a room, and Plaintiff denied the request.  As a result, it does not appear that Plaintiff can show the denial of a lactation room was causally connected to her sex or race, or that Defendant's proffered reasoning for the lack of a lactation room was pretext for animus.

## 2.  Hostile Work Environment

The motion for summary judgment is granted as to Plaintiff's hostile work environment harassment claim.  Title VII's prohibition of discrimination against any individual with respect to her employment "includes the prohibition against the creation of a hostile work environment."  *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 686 (9th Cir. 2017); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." (citations omitted)).

To prove her hostile work environment claim, Plaintiff needs to show "(1) that [she] was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1206 (9th Cir. 2016).  The conduct must be because of the Plaintiff's sex, race, or other attribute protected by Title VII.  *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002).  A workplace does not rise to the level of a hostile work environment if the employee is subject to teasing or isolated incidents, unless extreme.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)

("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotations omitted)).

Plaintiff does not establish that she was subject to objectively severe or pervasive harassment.  Plaintiff raises the following actions to demonstrate such harassment: Mr. Canfield's two comments about her pregnancy, having to reschedule a doctor's appointment and/or provide proof prior to taking time off for doctor's appointments, having to work weekends when others did not have to, Mr. Canfield making comments when Plaintiff was late but not when another employee was late, removing Plaintiff's business cards while she was on leave, acquiring an unsafe or unsuitable chair for Plaintiff, not complying with requirements for Plaintiff to use Mr. Canfield's office, and not providing Plaintiff a place to lactate during work hours.  Even viewing these allegations in the light most favorable to Plaintiff, courts require more to establish severe or pervasive harassment.

The Ninth Circuit has held that physical intimidation or an escalating pattern of hostile behavior can be sufficiently severe or pervasive to create a hostile work environment.  For example, in *EEOC v. Nat'l Educ. Assn, Alaska*, a supervisor of the defendant labor union regularly shouted at and physically intimidated his female employees.  422 F.3d 840, 843 (9th Cir. 2005).  The female employees felt physically threatened, operated in a "state of panic," and called the police on one occasion.  *Id.*  In this case, however, there is no such showing of physical intimidation, shouting, or an escalation of hostile behavior.  Plaintiff does not indicate that she was afraid of or intimidated by Mr. Canfield.  While she may have been subjectively offended by Mr. Canfield's management style, Plaintiff presents no evidence of intimidation, ridicule, or physical harassment.

In the absence of physical intimidation or an escalating pattern of hostile behavior, Plaintiff must show that Mr. Canfield's comments or behavior was not only offensive, but extreme.  Generally, individual offensive comments or teasing will not suffice as severe or pervasive, unless extreme.  *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000)

(finding employee's use of the terms "castrating bitch" and "Madonna" toward another employee insufficiently severe or pervasive).  The Ninth Circuit has outlined the contours of what types of comments are sufficiently extreme to create a hostile work environment. For example, in *Draper v. Coeur Rochester, Inc.*, a supervisor called a female employee "beautiful" and "gorgeous" rather than her name, told her about his sexual fantasies, and made several sexual comments toward her on many occasions.  147 F.3d 1104 (9th Cir. 1998).  The totality of the circumstances amounted to severe or pervasive harassment.  *See also Montero v. AGCO Corp.*, 192 F.3d 856, 860 (9th Cir. 1999) (finding severe or pervasive harassment when supervisor told employee he was going to spank her, made crude gestures, discussed sexual dreams about employee, tried to bite her neck, and made several sexual comments toward Plaintiff).  Here, Mr. Canfield's comments appear even less severe than in *Kortan* and are not comparable to the type of harassment in *Draper* or *Montero*.  The only comments Plaintiff points to are Mr. Canfield's comment that he did not think to offer her overtime because she was pregnant, Mr. Canfield's statement that he thought she was carrying "a little something extra" (referring to her pregnancy), and Mr. Canfield critiquing her when she arrived late to work.  While those comments certainly could be offensive to Plaintiff, as a matter of law, they do not constitute objectively severe or pervasive harassment under Title VII.  As such, Defendant's motion for summary judgment is granted as to the hostile work environment claim.

### 3.  Title VII Retaliation

Defendant's motion for summary judgment is granted as to Plaintiff's Title VII retaliation claims.  To prove a Title VII retaliation claim, Plaintiff must show that "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  Retaliation claims are analyzed using the *McDonnell Douglas* framework.  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008).  As noted above, this framework requires Defendant to offer a legitimate non-retaliatory reason for an adverse employment action.  *Id.* at 1106.  Then,

1    Plaintiff must provide some evidence that Defendant's reasoning is merely pretext for

2    retaliation. *Id.*

3          Here, Plaintiff's Title VII retaliation claim relates solely to the denial of the PBP in

4    April 2019.   Assuming that the denial of a transfer is an adverse employment action,

5    Plaintiff still fails to allege that Defendant's decision to offer the position to a different

6    individual is causally related to Plaintiff's protected activity and that Defendant's

7    non-retaliatory reasoning for the denial is pretextual.

8          At the outset, Plaintiff does not provide evidence that Ms. Selman, who ultimately

9    made the hiring decision as to the PBP, knew about Plaintiff's protected activity.  Plaintiff

10   alleges that Ms. Selman knew she was pregnant and taking leave, but she never told Ms.

11   Selman these things.   At her deposition, Plaintiff testified that she does not have any

12   evidence that Ms. Selman knew about the December 2018 charge.  (Doc. 59-2 at 145.)

13   Additionally, Ms. Selman states that she had no knowledge of any of Plaintiff's complaints

14   or a prior EEOC charge at the time of the decision.  (Doc. 63 ¶¶ 21-22.)  Mr. Canfield states

15   that he never spoke with Ms. Selman about Plaintiff.   (Doc. 59-8 ¶ 19.)   Plaintiff

16   nevertheless argues that the jury can infer that Ms. Selman knew that she had filed the

17   December 2018 EEOC charge.  She alleges that because Ms. Selman knew that Plaintiff

18   was pregnant and was on leave, one can infer that she also knew about Plaintiff's protected

19   activity.  (Doc. 59-2 at 148-49.)  Such speculation or inferences do not rebut Defendant's

20   uncontroverted evidence that Ms. Selman had no knowledge of Plaintiff's protected

21   activity.  Thus, Plaintiff does not show that her choice to hire a different individual was

22   causally connected to the filing of the December 2018 EEOC charge or any other complaint

23   that Plaintiff made.

24         Additionally, Plaintiff does not show that Defendant's proffered reasoning for hiring

25   a different individual was pretextual.  Defendant asserts that the reason it ultimately hired

26   a different candidate for the role was the candidate "had more experience as a personal

27   banker, had worked at the Surprise location in the past, and agreed to starting pay rate of

28   approximately $17.50 per hour."  (Doc. 63 ¶ 14.)  While Plaintiff disputes these facts, she

does not offer any evidence to suggest that these allegations are pretext for retaliation. She does not dispute that her salary for her role at the Scottsdale branch was $20.50 per hour. (Doc. 59 ¶ 6.) Defendant asserts, and it is not clear whether Plaintiff disputes, that Plaintiff stated her pay expectation for the PBP was around $25 per hour. (Doc. 63-1 ¶ 13; Doc. 69 ¶ 57.)

Further, the fact that the acting manager, Angela Corsino, allegedly told Plaintiff she had the job following an interview does not suggest pretext. Plaintiff states that Ms. Corsino, who conducted an initial interview for the PBP while she was serving as an acting branch manager, informed Plaintiff that she would receive the PBP. However, Defendant alleges that Ms. Selman, who later became the permanent manager, made the ultimate decision as to who would fill the role after interviewing the candidates. (Doc. 63 ¶ 12.) Plaintiff does not raise any evidence to suggest that Ms. Corsino had the authority to complete the hiring; nor does she suggest that she was not obliged to interview for the position with Ms. Selman prior to an effective offer being made. Thus, the fact that Ms. Corsino, while serving in the acting manager position, may have told Plaintiff she received the role verbally does not suggest that Ms. Selman's explanation for selecting an alternative candidate was pretextual. Ms. Selman offers several legitimate, non-retaliatory reasons as to why she declined to hire Plaintiff for the role. Plaintiff then must show pretext by demonstrating "specific and substantial circumstantial evidence." *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003). Ms. Corsino's earlier statement that Plaintiff would be hired is not inconsistent with Ms. Selman's proffered reasonings for hiring a different individual because Ms. Selman, not Ms. Corsino, had the authority to make the hiring decision. Thus, without more, Plaintiff does not meet the required threshold to demonstrate that Defendant's explanation was pretextual. As such, Plaintiff's Title VII retaliation claim is dismissed.

### B. Count VI (FSLA Retaliation)

Plaintiff's FLSA Retaliation claim also fails. To prove retaliation under the FLSA, Plaintiff must show "(1) she is engaged in activity protected by the FLSA; (2) the defendant

took an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action."  *Ader v. SimonMed Imaging Inc.*, 465 F. Supp. 3d 953, 975 (D. Ariz. 2020).  Defendant concedes that in May 2019, Plaintiff was engaged in a protected activity.  Defendant also does not appear to contest that Plaintiff's various EEOC charges and any complaints she sent via email constituted protected activity.

Nevertheless, even if the complaints and charges were protected activities and the failure to provide a lactation room is considered an adverse action, Plaintiff does not show a causal connection between the protected activity and the adverse action.  Plaintiff alleges that Defendant failed to provide a proper space for her to pump milk.  Importantly, however, she does not appear to allege that the branch had a proper space and denied her access to that space.  Instead, she alleges, and Defendant seems to concede, that for some period of time there was no private and sanitary space within the Scottsdale branch for her to pump.  (Doc. 59 ¶ 70; Doc. 69 ¶ 125.)

Ultimately, the Plaintiff's alleged adverse employment action under her FLSA retaliation claim is that the ongoing condition of the branch deprived her of the right to pump in a clean, private space.  This raises a causation issue, however, because she does not explain how the absence of a mother's room at the branch is causally linked to either her December 2018 charge or her request for a mother's room.  A causal link "can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action."  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011).  Here, there is not circumstantial evidence to suggest that the lack of a mother's room at the branch was in retaliation against Plaintiff's exercise of protected activities.  After Defendant was made aware of Plaintiff's need to lactate, Mr. Canfield attempted to transfer Plaintiff to a different branch that had a proper mother's room, but she declined the transfer because the hours did not work for her.  (Doc. 60-4.)  Defendant ultimately created a sufficient room at its Sun City branch for Plaintiff, albeit, months after Plaintiff's requests allegedly began.

Additionally, the temporal proximity between the alleged protected activity and

alleged adverse action does not support causation.  Because the branch appears to have lacked a mother's room before any of Plaintiff's purported protected activities, it is unclear how Plaintiff can show that the lack of a mother's room was in retaliation for her assertion of her rights.  To whatever extent Plaintiff argues that Defendant's retaliation is the failure to create a mother's room immediately after her request for one, the causal link is negated by Mr. Canfield's reaching out to HR to inform them of Plaintiff's request (Doc. 59-2 at 138-39), Defendant's attempt to transfer Plaintiff to a location with an existing lactation room (Doc. 69 ¶ 128), and ultimate creation of a mother's room at a location to which it could transfer Plaintiff (Doc. 59 ¶ 71).  Without evidence to create a causal link between her protected activity and the alleged adverse employment actions, Plaintiff cannot make out a prima facie case of retaliation under the FLSA.  As such, the claim is dismissed.

### C. Count V (FLSA Lactation Provision)

Plaintiff's claim under Section 207(r) of the FLSA does not present a compensable injury.  Under Section 207(r), employers are required to provide a "reasonable break for employees to express breast milk" and "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public" for the employee to express breast milk.  29 U.S.C. § 207(r)(1).  Damages for a Section 207(r) violation are limited to "unpaid minimum wages" and "unpaid overtime compensation."  29 U.S.C. § 216(b).  However, under the statute, employers "shall not be required to compensate an employee receiving reasonable break time" pursuant to its requirements.  29 U.S.C. § 207(r)(2).  The interplay between those two provisions has resulted in a district court split on what kinds of violations, if any, result in recoverable damages under the provision.

While some district courts have held that there is no private right of action at all under § 207(r), several others have held that there is a private right of action, but it rarely, if ever, is accompanied by compensable damages.  *Compare Eddins v. SSP Am., Inc.*, No. 4:12-cv-00177, 2013 WL 12128683, at *3 (S.D. Iowa Jan. 31, 2013), *with Clark v. City of Tucson*, No. CV 14-02543, 2018 WL 1942771, at *5 (D. Ariz. Apr. 25, 2018), *and Lico v. TD Bank*, No. 14-CV-4729, 2015 WL 34671569, at *3 (E.D.N.Y. June 1, 2015) ("Thus,

1   the penalty provision explicitly provides a private right of action for all violations of

2   Section Seven, which obviously includes § 207(r).  The entitlement to a private right of

3   action could not be more clearly stated in that provision.  At the same time, however

4   § 216(b) limits the remedies available for violations of § 207(r).").

5          Plaintiff advances two theories of recovery for the § 207(r) violation: emotional

6   distress and lost wages.  Emotional distress does not fall within the ambit of compensable

7   injuries for a § 207(r) violation, based on the plain language of § 216(b).  As such, Plaintiff

8   may not recover such damages.  The remaining question is whether Plaintiff can

9   demonstrate any lost minimum wages attributable to the alleged § 207(r) violation.

10         Some courts accept the notion that sick or vacation time can constitute lost minimum

11  wages, while wages that an employee would have been paid but for her termination after a

12  § 207(r) violation cannot.  For example, in *Clark v. City of Tucson*, the court considered

13  whether the plaintiff demonstrated compensable lost minimum wages when she used sick

14  or vacation time to lactate while she was assigned to a workstations that were not compliant

15  with § 207(r).  2018 WL 1942771, at *5-6.  The Court declined to grant summary judgment

16  for defendants on the § 207(r) claim because "Plaintiff's sick leave and vacation time are

17  financial assets, which she allegedly spent to avoid being forced to express milk at

18  noncompliant stations."  *Id.* at *6.  Further, the Court relied on the fact that "Plaintiff was

19  compensated for her time expressing milk at work, so the assigned breaks during a shift in

20  which she was forced to expend her own sick/vacation time raises a genuine issue as to

21  unpaid minimum wage."  *Id.*; *see also Poague v. Huntsville Wholesale Furniture*, 369 F.

22  Supp. 3d 1180, 1199 (N.D. Ala. 2019) (determining that a plaintiff could survive a motion

23  to dismiss because she had to leave a noncompliant workplace to express milk, thereby

24  having to "turn sales over to her colleagues and miss[ing] out on sales that she could have

25  made"); *McCowan v. City of Philadelphia*, No. 19-3326, 2021 WL 84013, at *17 (E.D. Pa.

26  Jan. 11, 2021) (declining to dismiss § 207(r) claim because Plaintiff "used leave time to

27  pump" and took "four weeks of sick time to address medical issues").  *But see Allison v.

28  City of Farmington*, No. CV 18-401, 2019 WL 2436266, at *4 (D.N.M. June 11, 2019)

("The Court concludes that use of compensatory or paid leave time does not fit within the narrow definition of 'unpaid wages' that are compensable under § 207(r).").

In a different type of case, however, courts have been unwilling to find that compensable damages exist when the Plaintiff's employment was terminated. For example, in *Mayer v. Professional Ambulance*, the Court rejected the argument that the "hours that were allegedly scheduled, but not worked because of Plaintiff's termination" constituted "unpaid minimum wages." 211 F. Supp. 3d 408, 414 (D.R.I. 2016). It stated: "While the Court is sympathetic to Plaintiff's argument that this renders Section 207(r) ineffective, there is no support from the case law or DOL [Department of Labor] for extending 'unpaid minimum wages' to wages that would have been earned but for a termination." *Id.* at 415; *see also Vedros v. Fairway Medical Ctr., L.L.C.*, No. 20-438, 2020 WL 3128838 (E.D. La. June 12, 2020) (holding that although § 207(r) and § 216(b) create an "enforcement paradox," hours that would have been worked but for termination are not compensable under the statute); *Hicks v. City of Tuscaloosa*, No. 7:13-cv-02063, 2015 WL 6123209, at *29 (N.D. Ala. Oct. 19, 2015) (holding that lost pay resulting from a demotion after asserting § 207(r) rights is not compensable as "unpaid minimum wages").

In light of the language of the statute, and the more persuasive approach of those courts interpreting it, Plaintiff cannot recover for her alleged lost wages under § 207(r). Unlike the plaintiffs who have established compensable damages under the statute, here Plaintiff does not allege that the damages she seeks are attributable to taking time off to pump or lactate. Instead, she alleges that her inability to pump in a sanitary and private place at work led to numerous medical problems that required her to take disability leave beginning in May 2019 through December 2019. Because she cannot recover compensatory damages for the medical issues under the statute, she would be limited to seeking the difference in disability pay and her typical pay.

There is no evidence that Plaintiff's 60% disability pay falls below "minimum wage" for the relevant period as outlined in the FSLA. Given that the statute establishes the only recoverable damages are "unpaid minimum wages," Plaintiff cannot demonstrate

any recoverable damages.  The statutory minimum wage is $7.25 an hour.  29 U.S.C. § 206(a)(1)(C).  Plaintiff's regular pay was $20.50 per hour.  Although Plaintiff was only paid 60% of her regular pay during the second half of her disability leave, she does not argue that her pay ever fell below the statutory minimum wage.  Thus, Plaintiff does not establish a dispute of fact as to unpaid minimum wages.  Because unpaid minimum wages are the only recoverable damages under the statute, Plaintiff does not preserve this claim.

Although this outcome, as other courts have acknowledged, highlights the "enforcement paradox" associated with § 207(r) and § 216(b), it is nevertheless most consistent with the language of the statute, and more supported in the case law and the interpretation of the Department of Labor.[2]  Courts reaching varying outcomes on the applicability of the statute appear to be unanimous that the remedies associated with § 216(b) are narrow, not broad.  Ultimately, Plaintiff seeks to recover the difference between her disability wages (60%) and her full wages while on disability leave for significant stress associated with an inability to pump at work.  To hold that these damages are compensable under § 207(r) would significantly broaden the scope of recovery under the provision.  Thus, summary judgment for Defendant is granted on this claim.

### D.  Count VII (Disability Discrimination)

Plaintiff's Americans with Disabilities Act ("ADA") and ACRA claims for disability discrimination and failure to accommodate fail because they are not properly exhausted, and she cannot succeed on the merits of the claims.

#### 1.  December 2018 Charge

Plaintiff's disability claims stemming from the December 2018 charge were not exhausted.  "The jurisdictional scope of the plaintiff's court action depends on the scope of the EEOC charge and investigation."  *Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003).  While "[t]he specific claims made in district court ordinarily must be presented to

---

[2] In a request for information from the public on the nursing mothers provision, the Department of Labor stated: "Because employers are not required to compensate employees for break time to express breast milk, in most circumstances there will not be an unpaid minimum wage or overtime compensation associated with the failure to provide such breaks."  Reasonable Break Time for Nursing Mothers, 75 FR 80073-01 (December 21, 2010).

the EEOC, . . . the district court has jurisdiction over any charges of discrimination that are 'like or reasonably related to' the allegations made before the EEOC, as well as charges that are within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations." *Id.* Thus, in this case, Plaintiff must demonstrate that her civil disability-related claims were presented in her EEOC charges or are reasonably related to those presented in the charges.

The disability Plaintiff alleges is pregnancy related anemia. (Doc. 68 at 13.) The accommodation Plaintiff alleges she was denied due to her disability is a chair to ensure she was not standing for extended periods of time. (Doc. 68 at 13-14.) She further alleges that she faced discrimination because of this disability because Mr. Canfield did not offer her overtime opportunities. (Doc. 68 at 14.)

The only EEOC charge that contains any of the above disability-related incidents is the December 2018 charge, which asserts that Mr. Canfield was unaware that Plaintiff was pregnant until her first day on the job and did not offer her overtime opportunities because she was pregnant. (Doc. 62-1 at 9-10.) While those allegations may reasonably relate to the Title VII violations the charge asserts, it contains "no hint of [disability] discrimination." *Accord Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 675 (9th Cir. 1988). The charge mentions only the failure to provide overtime opportunities and does not mention the failure to provide an accommodation for a disability, including Plaintiff's request for a chair. Importantly, the charge also does not assert an ADA or ACRA disability-related claim and does not refer to Plaintiff's pregnancy-related anemia or any other disability.

Although "[w]e construe the language of EEOC charges with the utmost liberality, there is a limit to such judicial tolerance when principles of notice and fair play are involved." *Freeman v. Oakland Unified School Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) (internal quotations omitted). Plaintiff's disability claims in this case rely on a different theory of relief and a different statutory scheme than Plaintiff alleged in the December 2018 charge. Even one of those differences can establish that there is no "fit" between the

administrative charge and the civil claim. *Ong v. Cleland*, 642 F.2d 316, 318 (9th Cir. 1981). In *Ong v. Cleland*, the Ninth Circuit determined that a constructive discharge claim was not sufficiently presented in an administrative charge that alleged a denial of a promotion. *Id.* at 320. Although the Plaintiff asserted that the claims arose from the same circumstances because she had to take disability retirement after the Defendant's failure to promote her, the Court held that the constructive discharge claim was not presented to the agency. *Id.* Here, too, although Plaintiff alleges that her disability claim arises out of the same set of circumstances as the Title VII claims, the agency would have no occasion to consider whether she was denied an accommodation such as a chair based on her pregnancy-related anemia because none of those facts were alleged in the charge.

Additionally, the December 2018 charge is based on an entirely different statutory scheme. In *Leong v. Potter*, the Ninth Circuit held that Plaintiff could not raise a disability claim in the district court when his EEOC charge contained only allegations of discrimination "on the basis of race, color, religion, sex, and/or national origin in violation of Title VII." 347 F.3d at 1120. The Court emphasized that "[n]othing in Leong's affidavit would have led the EEOC to suspect that he was disabled or had been subjected to disability discrimination." *Id.* at 1122. As such, "[a] decision that an EEOC complaint with no mention whatsoever of disability is 'like or reasonably related to' Leong's disability claim would reduce the exhaustion requirement to a formality." *Id.* at 1122. Here, Plaintiff's case presents the same disconnect. No reading of her December 2018 charge would suggest that she had a disability; thus, she has not exhausted her ADA claims related to that charge.

### 2.  June 2019 Charge

As for the June 2019 charge, Plaintiff cannot succeed on the merits of an ADA discrimination or failure to accommodate claim. The June 2019 charge relates exclusively to Defendant's failure to provide adequate space or time for Plaintiff to pump breast milk after her maternity leave. In the original June 2019 charge, Plaintiff does not reference the ADA, a disability, or pregnancy-related anemia. In the January 2020 amendment to the

charge, Plaintiff re-alleges the exact same facts, but includes a statement that the discrimination was also in violation of the ADA and the Arizona Civil Rights Act.

Even if the January 2020 amendments related back to the June 2019 charge, Plaintiff has not established a genuine dispute of material fact that would enable her to succeed on her ADA claims.  To succeed on a disability discrimination claim, Plaintiff must show: (1) she has a disability, (2) she was qualified to perform the essential functions of her job, with or without reasonable accommodation, and (3) she suffered an adverse action because of her disability.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Fallar v. Compuware Corp*., 202 F. Supp. 2d 1067, 1082 (D. Ariz. 2002).  Here, it is not clear that Plaintiff had a disability.  Plaintiff asserts that the disability at issue for the ADA claim is pregnancy-related anemia.  However, she does not appear to allege that the condition continued after her return from maternity leave.  Plaintiff repeatedly characterizes her disability as anemia "*during* her pregnancy." (Doc. 68 at 14-15.)  Thus, if the anemia did not continue postpartum, Plaintiff does not advance any condition that could be considered a disability to form a claim on the grounds asserted in the June 2019 charge.  Further, Plaintiff does not demonstrate any causal link between her pregnancy-related anemia and the failure to provide a mother's room.  To the contrary, all of Plaintiff's allegations about Defendant's failure to accommodate the disability surround the events prior to her maternity leave.  (*See* Doc. 68 at 14-15.)  As such, she cannot succeed on a disability discrimination claim for the events outlined in the June 2019 charge.

Additionally, to establish a claim for failure to accommodate, Plaintiff must show: (1) she was disabled, (2) she requested accommodations, (3) USB did not make a good faith effort to make accommodations, and (4) USB could have reasonably accommodated, but for its lack of good faith. *Pickens v. Astrue*, 252 F. App'x 795, 796 (9th Cir. 2007). The same questions as to whether Plaintiff's alleged disability remained postpartum apply here.  Additionally, Plaintiff does not demonstrate how her request for a mother's room is related to her alleged disability.  In other words, her need for a room to lactate was entirely independent of her pregnancy-related anemia; whether or not she had a disability, the need

for a lactation space would remain.  To be sure, Defendant was obligated to provide a private and sanitary mother's room at least under § 207(r) of the FLSA.  That obligation, however, does not arise from the ADA or the Plaintiff's disability.  Thus, Plaintiff has not shown how a mother's room is a reasonable accommodation for her pregnancy-related anemia, nor has she alleged any other disability that would specifically require a mother's room.  *See* 42 U.S.C. § 12112(b)(5)(A) (stating that the reasonable accommodation is "*to the known physical or mental limitations*" of the employee (emphasis added)).  Thus, the only accommodation Plaintiff could have reasonably requested is a chair during her pregnancy, which was not in, like, or reasonably related to the June 2019 charge.

Because Plaintiff's disability claims arising from the June 2018 charge were not exhausted and the remaining claims fail as a matter of law, Defendant's motion for summary judgment is granted as to Count VII (ADA Discrimination and Failure to Accommodate).

### E.  Count VIII (Arizona Civil Rights Act)

#### 1.  Race and Sex Discrimination

Any ACRA race or sex discrimination claim predicated on the December 2018 charge is time-barred.  Plaintiff concedes that she received a right-to-sue letter on June 6, 2019.  (Doc. 68 at 1.)  Because this lawsuit was filed on June 15, 2020, it is outside both the blanket one-year limitations period and the ninety-day limitations period triggered by the right-to-sue letter.  *See* Ariz. Rev. Stat. § 41-1481(D).  Thus, Plaintiff may not bring any ACRA claim predicated on the December 2018 charge.

#### 2.  Disability Discrimination

Plaintiff's ACRA disability discrimination claim contains the same deficiencies as her ADA disability discrimination claim.  That is, even if the claims are timely, they are limited to the scope of the June 2019 Charge.  Because that charge relates exclusively to Defendant's failure to provide a proper location for Plaintiff to lactate and does not allege that she had a disability, she cannot meet the elements of a disability discrimination claim based on the charge.  As such, she cannot bring an ACRA disability discrimination claim.

### 3.  Retaliation

To whatever extent Plaintiff alleges a retaliation claim under the Arizona Civil Rights Act for the denial of the PBP, it is dismissed.  "The ACRA is generally identical to Title VII, and thus federal Title VII case law is persuasive in interpreting the ACRA." *Everts v. Sushi Brokers LLC*, 247 F. Supp. 3d 1075, 1084 (D. Ariz. 2017).   Because Plaintiff's Title VII retaliation claim fails, so too does her ACRA retaliation claim.

### CONCLUSION

Accordingly,

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 58) is **GRANTED** in part and **DENIED** in part.  The motion is granted as to Counts III, IV, V, VI, VII, and VIII, which are dismissed.  The motion is granted as to Counts I and II insofar as they allege discrimination based on anything other than a denial of overtime.  The motion is denied as to Counts I and II as they relate to disparate treatment discrimination in the denial of overtime.

Dated this 31st day of January, 2023.

G. Murray Snow
Chief United States District Judge